**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ELLEN MAGEE, d/b/a MAGEE FARMS, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0170-NAC |
| | ) | |
| CLAYTON BUNTING, SR., CLAYTON BUNTING, JR., and PENINSULA NURSERIES, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Plaintiff Ellen Magee leased farmland from Defendant Peninsula Nurseries, Inc. ("PNI").  In 2022, PNI terminated the leases, then asserted ownership over irrigation systems that Magee purchased for and used on two of her three leaseholds.  Magee brought this expedited action to obtain a permanent injunction allowing her to retrieve the irrigation systems.  This order makes post-trial findings of fact and reaches conclusions of law that address the rightful ownership of the irrigation systems.  Based on those determinations, this order enters judgment in favor of Magee and issues a permanent injunction.

2.      The evidence presented at trial supports the following findings of fact:[1]

---

[1] I have carefully considered all the evidence and cite to specific documents where appropriate.  Citations in the form of "JX [#] —" refer to the trial exhibits.  Citations in the form of "Tr. — ([Witness])" refer to testimony from the trial transcript.  Citations in the form of "PTO ¶ —" refer to the parties' pre-trial stipulations of fact.  *See* Dkt. 45.  On May

a.   Magee is a tenant farmer who operates her own farming business. She leases eighteen parcels, including in Sussex County, Delaware. Fourteen of her leases are oral contracts. Tr. at 7:10–11 (Magee). It is not unusual for Sussex County farmers to enter into oral lease agreements. *Id.* at 135:23–136:1 (Def. Expert).

b.   PNI is a corporate landlord that owns and leases farmland in Frankford, Delaware. PNI has done so for generations. *Id.* at 139:10–18 (Clayton).

c.   Until 2012, Gene Bunting was PNI's sole operator. PTO ¶ 1. During Gene's[2] tenure, PNI's lease agreements were short and used relatively straightforward language. *E.g.*, JX 1 (2006 Lease).

d.   Magee leased three parcels from PNI.

  i.   In 2006, Magee leased a parcel located along Route 501.

  ii.   In 2010, Magee leased a parcel located on Shockleytown Road (together with the Route 501 parcel, the "Frankford Farms").

  iii.   In 2010, Magee leased a parcel on Cat Man's Road (the "Cat Man's Road Farm").

---

31, 2023, I participated in a site visit with the parties' counsel. I thank counsel for coordinating the site visit, which was helpful to the Court and may be considered in resolving this dispute. *See, e.g.*, *Penn Mart Supermarkets v. New Castle Shopping LLC*, 2005 WL 3502054, at *11 n.82 (Del. Ch. Dec. 15, 2005).

[2] I ordinarily refer to individuals by surname. In this case, multiple individuals share the surname "Bunting." To minimize confusion, I refer to persons sharing the surname "Bunting" by their first names. I intend no familiarity or disrespect in doing so.

e.	In 2010, Magee and Gene discussed the prospect of irrigating her leaseholds.  As PNI's President,[3] Gene told Magee that, if she purchased irrigation systems, they would be her property and she could remove them from the land.  Tr. at 24–25:24, 34 (Magee).[4]

f.	Magee purchased four "pivot" irrigation systems (the "Irrigation Systems")[5] and used them on the Frankford Farms.  Magee did not use any irrigation systems on the Cat Man's Road Farm.  *See* PTO ¶¶ 6, 10.  That farm is unirrigated.

i.	Magee paid approximately $200,000 for the Irrigation Systems and covered all their maintenance costs.  PNI did not pay for anything.

ii.	In addition to paying for the Irrigation Systems, Magee depreciated and claimed them as deductions on her tax returns for several years.

iii.	The Irrigation Systems are bolted at the central pivot onto small concrete pads.  This structure is customary and promotes stability.  This structure also prevents the Irrigation Systems from breaking apart as they pivot and water the fields.

---

[3] *See, e.g.*, JX 1 (2006 Lease) (signature); Tr. at 14:13–17 (Magee); *see also* PTO ¶ 1.

[4] Gene died in 2018, so he was not available to testify.  Defendants have objected to Magee's testimony on hearsay grounds.  As explained later, the objection is overruled.

[5] Pivot irrigation systems spray water onto crops by rotating circularly around a central pipe connected by way of further buried pipe to an underground well and pump.  *See, e.g.*, Tr. at 88:15–18, 101:16–18 (Pl. Expert); Tr. at 114:23–115:2 (Def. Expert); *see also* JX 16 at 1 (Def. Expert Report).

iv.     The Irrigation Systems contain a hole or hook for inserting a towing hitch.[6] They are not immobile.[7]

g.     In 2012, Gene gifted ownership of PNI to his son, Defendant Clayton Bunting, Sr.  Clayton is a lawyer.  Clayton testified that Gene never told him about PNI and Magee's understanding of the Irrigation Systems.

h.     After he assumed control of PNI, Clayton reviewed PNI's assets.  Clayton observed that the Frankford Farms were PNI's only irrigated parcels.  *See* Tr. at 143.  He also observed that the rent charged to the Frankford Farms was "above the general market range" and 50% greater than the rent paid by the rest of PNI's tenants.  *Id.* at 144:14–18, 173:9–10.  Clayton knew the Irrigation Systems were valuable to their owner.  *See, e.g., id.* at 174:19–175:2 (urging that loss of the Irrigation Systems would be "devastating" to PNI's bottom line).

i.     After he assumed control of PNI, Clayton reviewed PNI's existing leases.  Clayton found those leases to be "inadequate" and too "brief . . . for [his] taste[.]"  *Id.* at 145:22.  So he sought to create a "comprehensive" lease agreement that would apply to all PNI's tenants.  *Id.* at 142, 145:23–146:1.

---

[6] *See, e.g.*, Tr. at 108:22–109:16 (Pl. Expert); JX 15 (Pl. Expert Report).  Magee's expert illustrated the towing process using a dolly wheel and other tools as demonstratives. Defendants did not object to my consideration of this evidence.

[7] On cross examination, Defendants' expert clarified that his definition of "towable" meant daily or near-daily movement across a field.  Tr. at 132:1–6.  He agreed that irrigation systems connected to concrete pads are nonetheless moveable.  *Id.* at 132–33:10.

4

j.      In 2017—the year Magee's existing leases were set to expire—Clayton presented her with the redrafted leases (the "2017 Leases"). The 2017 Leases are significantly lengthier than the prior leases and use more complicated language. Magee had no role in drafting them. *Id.* at 191:1–5 (Clayton).

i.      In drafting the 2017 Leases, Clayton drew from a hodgepodge of sources. He examined maps prepared by the United States Department of Agriculture and "rent per acre projections" from a "national farm research group." *Id.* at 154:12–16. Clayton also conducted "nationwide" legal research, including on "the law of fixtures" in foreign jurisdictions, and canvassed documents available to him at his law firm. *Id.* at 145:4–18, 225:24–226:4. Clayton analogized his process to the work of "a chef in a kitchen, [who] assemble[s] all of the recipe items" and "bring[s] [them] to the table[.]" *Id.* at 141:11–12, 145:11. There is no evidence that Clayton had prior experience drafting lease agreements, let alone agricultural lease agreements.

ii.      In drafting the 2017 Leases, Clayton crafted a provision governing "improvements" ("Section 4(h)"). Section 4(h) provides:

> Tenant covenants, promises and agrees . . . [n]ot to erect any buildings or other improvements . . . without otherwise first obtaining written consent of [PNI] . . . it being understood and agreed any and all improvements and or alterations, all of which shall become and remain part thereof . . . Tenant being required to yield all improvements up to [PNI] at the end of the term . . . as the sole property of [PNI] . . . .

5

JX 13 (2017 Frankford Farms Lease). Section 4(h) appears in all the 2017 Leases.

iii. In the 2017 Cat Man's Road Farm lease, Clayton included language addressing "irrigation system improvements." This language provides:

> The parties hereby confirm and agree that the seven year term with level per acre rent serves as fair, sufficient, and adequate incentive and inducement for Tenant to make irrigation system improvements upon the same at Tenant's sole proper cost and expense designed for their mutual benefit fully subject to the provisions hereof applicable thereto.

JX 24. No other lease contains this language or references irrigation systems.

iv. In drafting an amendment to the 2017 Leases, Clayton added a "service fee" provision. This provision targeted late rent payments, and enabled PNI to charge what amounts to interest on the total amount owed. The provision functioned as a penalty, entitling PNI to as much as 30% interest on one late payment.

k. Clayton sought to explain the 2017 Leases to Magee. Magee was not represented by counsel at this time.

i. Before this discussion, Magee had been planning to purchase an irrigation system for the Cat Man's Road Farm.

ii. During this discussion, Magee objected to Clayton's suggestion that the "irrigation system improvements" language would cause her planned irrigation system to become PNI's property. Tr. at 156:12–14 (Clayton).

6

iii.     After this discussion, Magee abandoned her plan to purchase an irrigation system for the Cat Man's Road Farm.

l.     Although Section 4(h) does not expressly reference the Irrigation Systems, Clayton believed the term "improvements" was "plenary" and "all-encompassing," *i.e.*, broad enough to capture the Irrigation Systems. *Id.* at 197. Clayton alternatively believed that an express reference was unnecessary. Based on his understanding of property precedent, and his personal observations of the Irrigation Systems, Clayton concluded that the Irrigation Systems were fixtures and thus PNI's property regardless of the 2017 Leases.[8]

m.     Magee thought Section 4(h) was intended to capture a "fruit and vegetable stand" that she had wanted to build on her leaseholds. *See, e.g.*, *id.* at 151:11–14 (Clayton). Magee expressed this to Clayton before she signed the 2017 Leases. *See* JX 28 (2017 Letter to PNI from Magee Re: Lease Renewal). Clayton acknowledged that the fruit and vegetable stand was a "factor" in drafting Section 4(h). Tr. at 191:6–11.

---

[8] *See, e.g.*, *id.* at 149:5–10 (Clayton) ("From my observations and from my understanding of the law . . . my conviction [was] that [the Irrigation Systems] were part of the realty and that the die was cast in that regard . . . ."); *id.* at 153:15–23 (Clayton) ("[A]s I said, the die had already been cast. [The Irrigation Systems] were part of the realty. If additional improvements were to be made, they would be encompassed [under Section 4(h)]. But as far as being the property of the owner of the land, the landlord, that included all of the improvements, including the existing improvements by way of irrigation systems at the time [the 2017 Leases were] signed."); *id.* at 226:18–20 (Clayton) ("The law dictated [that the Irrigation Systems were PNI's property] and the contract affirmed it . . . .").

n. In July 2022, Magee missed a $3,000 rent payment. *Id.* at 220:23 (Clayton). PNI responded by imposing a 30% "service fee" on Magee.[9] PNI then secured a lien on all Magee's existing and future crops. *See* JX 29 (Security Agreement). And Clayton began "driving by" PNI's properties to determine whether Magee had harvested products that could be sold to cure the default. *See* Tr. at 166, 221 (Clayton).

o. On October 18, 2022, PNI terminated the 2017 Leases. JX 30.[10] Ever since, Defendants have asserted ownership over the Irrigation Systems and continue to deny Magee access to them. Growing season is underway, so I granted Magee's motion to expedite and held a one-day trial on June 2, 2023.

3. Magee sought to prove that she is entitled to a permanent injunction prohibiting PNI from claiming ownership of the Irrigation Systems and allowing her to retrieve them. To obtain a permanent injunction, the claimant must demonstrate "(i) actual success on the merits, (ii) the inadequacy of remedies at law, and (iii) [that] a balancing of the equities . . . favors an injunction." *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1232–33 (Del. Ch. 2022).

---

[9] The 30% rate reflects an aggregate charge that began as a 5% charge and, after several months, increased by additional 25%. *See id.* at 165:4–12, 220:23–221:9 (Clayton).

[10] The termination notice declared the 2017 Leases "null and void." JX 30 at 5. As a result, Magee has argued that Defendants cannot claim any rights under the 2017 Leases. *See generally CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816–19 (Del. 2018). Given my analysis below, I need not reach this argument or Defendants' defenses to it.

4. A permanent injunction is a remedy. And relief presupposes an injury. So the actual success inquiry focuses on Magee's underlying claim: that she owns the Irrigation Systems. This is a question of contract.

a. The parties agree that Delaware law governs the 2017 Leases.

i. Under Delaware law, the goal of contract interpretation is to "effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, a court gives "priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (internal quotation marks omitted). Even the most "steadfast disagreement over interpretation will not, alone, render the contract ambiguous." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

ii. Delaware courts "give words their plain meaning unless it appears that the parties intended a special meaning." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). "When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the

established legal meaning of the terms." *Penton Bus. Media Hldgs. v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018).[11]

b.     Defendants contend that they own the Irrigation Systems because the Irrigation Systems are "improvements" under Section 4(h) and thus, PNI's "sole property." This position assumes Section 4(h) reaches structures that existed on PNI's land before Magee executed the 2017 Leases. It does not.

i.     Section 4(h) requires the tenant to obtain PNI's approval before "erect[ing] buildings or other improvements." Only then do "all" those buildings or other improvements become PNI's "sole property."

ii.     Given its sequence, approval process, and use of an active verb, Section 4(h) plainly does not capture buildings or other improvements that existed on PNI's land before the execution of the 2017 Leases. Indeed, it is difficult

---

[11] *See, e.g.*, *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) (Strine, V.C.) ("[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."); *accord In re P3 Health Gp. Hldgs.*, 282 A.3d 1054, 1067 (Del. Ch. 2022) ("Put another way, 'unless a different intention is manifested' in the contract, . . . 'technical terms and words of art are given their technical meaning . . . .'" (quoting Restatement (Second) of Contracts § 202(3) (Am. L. Inst. 1981))); *see also Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *26 (Del. Super. July 29, 2021) (LeGrow, J.) (defining a standard of review in an audit provision using federal tax law because the parties included "technical tax language" throughout the provision); *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 290 n.58 (Del. 2016) (noting in analytically analogous context of statutory interpretation that courts "presume" words with "well-settled legal meaning" are intended to be understood "in their legal sense" (internal quotation marks omitted)); *cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 886 A.2d 1, 19 (Del. Ch. 2005) (presuming that a contract using words with "no accepted blackletter legal definition . . . was an implicit agreement . . . to avoid the use of legal terms of art"), *aff'd*, 903 A.2d 728 (Del. 2006).

to imagine how a tenant could obtain PNI's approval to erect an improvement that already had been erected before the tenant signed the lease. It is likewise difficult to imagine how a tenant could "erect" an improvement that already had been "constructed" or "established" before she got there. *Erect*, Black's Law Dictionary (11th ed. 2019). Contract interpretations that "produce absurd results must be rejected." *Manti Hldgs. v. Authentix Acq. Co.*, 261 A.3d 1199, 1221 (Del. 2021).

iii.     Plainly read, PNI obtains ownership under Section 4(h) if the building or other improvement is erected post-execution, during the lease term. The Irrigation Systems were erected before the execution of the 2017 Leases. So they are not "improvements" under Section 4(h).

iv.     What plain meaning suggests, legal meaning confirms. "Improvement" is a term of art. Under property law, improvements are defined to include "the erection of building[s], . . . the construction of sidewalks, the erection of fences, and the preparation of land for building sites." 42 C.J.S. *Improvements* § 1, Westlaw (database last updated May 2023). Put conceptually, improvements are "additions" to land that adapt the land for "new" or future "purposes."[12]  Under Section 4(h), "improvements" cannot be structures on PNI's land that existed before

---

[12] *Laumbach v. Westgate*, 2008 WL 3846419, at *5 n.27 (Del. Ch. Aug. 19, 2008) (Strine, V.C.) (citing 42 C.J.S. *Improvements* § 1, Westlaw (database last updated May 2023)), *aff'd*, 966 A.2d 349 (Del. 2009) (TABLE). *See, e.g., Improvement*, Black's Law Dictionary (11th ed. 2019) ("An addition to property").

a tenant leases the land, because the tenant cannot add what already had been added. And here, the Irrigation Systems were added to the Frankford Farms before 2017.

v. Precedent has embraced this interpretation. In *Laumbach v. Westgate*, for example, then-Vice Chancellor Strine considered whether property owners living in a residential community ("Gardenside") violated restrictive covenants governing their subdivision by constructing an "oversized driveway." 2008 WL 3846419 (Del. Ch. Aug. 19, 2008), *aff'd*, 966 A.2d 349 (Del. 2009) (TABLE). Gardenside's Declaration of Covenants contained language virtually identical to Section 4(h). The Declaration prohibited the property owners from "erect[ing]" any "building, structure or other improvement" without Gardenside's approval. *Id.* at *5. Then-Vice Chancellor Strine concluded that a "common sense reading" of the Declaration captured the oversized driveway because it was not extant on the subdivision before the property owners bought it. *Id.* Instead, the driveway constituted an improvement because it caused a "significant change" to the subdivision's "pre-existing condition." *Id.* Here, by contrast, the Irrigation Systems were part of the Frankford Farms' "pre-existing condition" before Magee executed the 2017 Leases.

vi. The rest of the leases reinforce this conclusion. "As a matter of black letter law, 'all writings that are part of the same transaction are interpreted together.'" *Fla. Chem. Co. v. Flotek Indus.*, 262 A.3d 1066, 1081 (Del.

12

Ch. 2021) (quoting Restatement (Second) of Contracts § 202(2) (Am. L. Inst. 1981)). So "contemporaneous contracts between the same parties concerning the same subject matter [generally] should be read together as one contract." *Comerica Bank v. Glob. Payments Direct, Inc.*, 2014 WL 3567610, at *7 (Del. Ch. July 21, 2014).

vii.     Section 4(h) appears in all the 2017 Leases. The Frankford Farms contain the Irrigation Systems. The Cat Man's Road Farm is unirrigated. The 2017 Cat Man's Road Farm lease contemplated future "irrigation system improvements." JX 24. That language does not appear in any other lease.

viii.     Read together, the "irrigation systems improvements" language clarifies that the Irrigation Systems are not "improvements" under Section 4(h). Otherwise, there would be no need to add that language to the 2017 Cat Man's Road Farm lease, which already contained Section 4(h). And because that language does not appear in the 2017 Frankford Farms leases, the only reasonable reading is that *future* irrigation systems qualify as PNI's property, not *existing* ones. Defendants' contrary reading violates the "basic rule of construction that no part of an agreement should be rendered superfluous," *Intel Corp. v. Am. Guar. & Liab. Ins. Co.*, 51 A.3d 442, 451 (Del. 2012), and contradicts the "overall scheme and plan" distinguishing the 2017 Leases, *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). Their reading is therefore unreasonable. The 2017 Leases unambiguously do not grant PNI ownership over the Irrigation Systems.

c. Section 4(h) is not ambiguous. Even if it were, Defendants' theory still would fail.

i. If a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (internal quotation marks omitted). In that setting, the interpreting court considers extrinsic evidence. *See, e.g.*, *Sunline Com. Carriers, Inc. v. CITGO Petro. Corp.*, 206 A.3d 836, 847 (Del. 2019). Still, "unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language." *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998) (emphasis in original). Absent evidence of bilateral negotiation, courts "apply the doctrine of *contra proferentem* against the drafting party and interpret the [ambiguous] contract in favor of the non-drafting party." *Osborn*, 991 A.2d at 1160.

ii. Clayton drafted the 2017 Leases and proposed them to Magee just before her leases expired. In drafting the leases, Clayton incorporated technical property concepts and relied on resources exclusive to his law firm. Using his specialized knowledge, Clayton added language that, when contrasted with PNI's prior leases, was abstruse, lengthy, and difficult for an uncounseled non-lawyer— like Magee—to understand. Using his specialized knowledge, Clayton inserted a provision penalizing late rent payments with a very high interest rate for an

14

agricultural lease.[13]   Although Clayton "discussed" these terms with Magee, he admitted that she had no role in choosing them.  *See* Tr. at 191:1–5 (Clayton) ("If you're asking me what language in [Section] 4(h) she prepared and submitted as the author for me to insert, she did not do that.  I was the drafter of the language . . . .").

iii.   Against this background, Defendants interpret Section 4(h) to capture past "improvements," *i.e.*, the Irrigation Systems.  As explained, that reading is unreasonable.  But even if it were reasonable, Magee's reading would be more reasonable.  And at this post-trial stage, I must choose the most reasonable interpretation of ambiguous language.  *See GMG Cap.*, 36 A.3d at 783–84.

iv.   Magee interprets Section 4(h) to capture only future improvements, such as the fruit and vegetable stand she discussed with Clayton before she signed the 2017 Leases.  This makes sense because Section 4(h) defines "improvements" in terms of "buildings."[14] Clayton himself considered the fruit and

---

[13] Although not essential to my analysis, I note that it is unclear what "services" PNI performed when Magee missed her rent payment.  Regardless of their titles, Delaware courts generally do not enforce contractual provisions that operate as penalties, *see Del. Bay Surgical Servs. v. Swier*, 900 A.2d 646, 650 (Del. 2006), particularly where a provision provides for a payment "untethered" to the nonbreaching party's actual damages, *Lyons Ins. Agency v. Wark*, 2020 WL 429114, at *7 (Del. Ch. Jan. 28, 2020); *accord Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *12 (Del. Ch. Jan. 4, 2023).  *See Unbound P'rs Ltd. P'ship v. Invoy Hldgs.*, 251 A.3d 1016, 1035 (Del. Super. 2021) (Wallace, J.) ("Delaware courts [decline to enforce liquidated damages provisions] where the recourse chosen is totally outside the breach's natural dimensions [or] is inconsistent with the parties' relationship . . . .").

[14] Given the construction "erect buildings or other improvements," Section 4(h) must be read to harmonize the general term "other improvements" with the more specific term

vegetable stand in drafting Section 4(h). It also makes sense in light of the text and history of the 2017 Cat Man's Road Farm lease.

v.     As discussed, the 2017 Cat Man's Road Farm lease included a provision addressing future "irrigation system improvements" but the 2017 Frankford Farms leases did not. The difference supports a finding that Section 4(h) was not meant to capture the Irrigation Systems, but rather the fruit and vegetable stand. By the same token, the difference supports a finding that the "irrigation system improvements" language was not meant to capture the fruit and vegetable stand, but rather to "incentivize and induce" Magee to irrigate the Cat Man's Road Farm. JX 24. Indeed, after Magee learned of Clayton's position on the 2017 Cat Man's Road Farm lease, she aborted her plan to irrigate the Cat Man's Road Farm. That decision is powerful evidence that Section 4(h) was never intended by the parties at the time of contracting to capture the Irrigation Systems.

vi.     If this were not enough, Clayton drafted the 2017 Leases. In an interpretive contest over language in a contract between a lawyer and an uncounseled farmer that was drafted solely by the lawyer, the farmer easily wins. To the extent the parties have each offered a reasonable interpretation of Section

---

"buildings." *See DCV Hldgs. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). A commercial fruit and vegetable stand is closer to a "building" than farming equipment. *See Building*, Black's Law Dictionary (11th ed. 2019) ("A structure with walls and a roof").

4(h), the doctrine of *contra proferentem* compels Magee's interpretation. Under any analysis, Section 4(h) did not grant PNI a right to own the Irrigation Systems.[15]

d. That is not the end of the matter. The 2017 Leases do not expressly grant Magee a right to the Irrigation Systems either. So Defendants alternatively contend that they own the Irrigation Systems under default rules governing fixtures. But Magee proved that those rules do not apply because she had an oral agreement with PNI granting ownership of the Irrigation Systems to her. PNI breached its contract by refusing to allow her to retrieve the Irrigation Systems.

i. "Under Delaware law, a party asserting a breach of an oral agreement must prove the existence of an enforceable contract by a preponderance of the evidence." *Schaeffer v. Lockwood*, 2021 WL 5579050, at *15 (Del. Ch. Nov. 30, 2021) (internal quotation marks omitted). "The elements necessary to prove the existence of an enforceable contract are: (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration." *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012). Contract formation involves questions of both law and fact. *See, e.g.*, *Eagle Force Hldgs. v. Campbell*, 187 A.3d 1209, 1229–38 (Del. 2018).

ii. Magee testified that, in 2010, Gene, as PNI's President, agreed the Irrigation Systems would remain her property after the termination of the

---

[15] At trial, Clayton conceded that Section 4(h) is the only provision in the 2017 Leases that could grant PNI a right to the Irrigation Systems. *See* Tr. at 225:8–19.

17

leases. Independent evidence corroborates her testimony. For example: (a) Magee is a party to fourteen oral leases; (b) Magee purchased the Irrigation Systems with her own money; (c) Magee paid for all the costs of maintaining the Irrigation Systems over the next twelve years; (d) Magee depreciated the Irrigation Systems and claimed them as deductions on her tax returns after she bought them; (e) PNI did not contribute anything to the acquisition of the Irrigation Systems; (f) PNI did not contribute anything to the maintenance of the Irrigation Systems; and (g) Defendants' expert witness testified that, in the Sussex County farming industry, it is common for parties to agree orally to key lease terms. All this and more establishes an oral agreement by a preponderance of the evidence.[16]

---

[16] *See Eagle Force*, 187 A.3d at 1229–30 (*Intent*: "[I]n applying [an] objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other . . . *i.e.*, their words and actions . . . . [I]n resolving this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement." (citation omitted)); *Eagle Force*, 187 A.3d at 1229–30 (*Definiteness*: "A contract is sufficiently definite and certain . . . if the court can—based upon the agreement's terms and applying . . . principles of equity—ascertain what the parties have agreed to do . . . . [I]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." (internal quotation marks omitted) (adopting *Carteret Bancorp v. Home Gp., Inc.*, 1988 WL 3010, at *9 (Del. Ch. Jan. 13, 1988) (Allen, C) (Contract terms are sufficiently definite if the terms "provide a basis for determining the existence of a breach and for giving an appropriate remedy." (quoting Restatement (Second) of Contracts § 33(2))); *First Mortg. Co. v. Fed. Leasing Corp.*, 456 A.2d 794, 795–96 (Del. 1982) (*Consideration*: "It is well settled that consideration can consist of either a benefit to the promisor or a detriment to the promisee.").

iii. Plus, Magee was a credible witness. She presented as a proverbial straight shooter who recalled the past with unembellished conviction. She was responsive to questions and her story was internally consistent. She knew Gene personally, spoke with him frequently, and farmed his land for nearly two decades. There is nothing in the record to suggest she would have accepted the 2017 Leases after investing $200,000 in the Irrigation Systems if she knew PNI would try to take them from her one day. *See, e.g.*, Tr. at 56:17–20 ([Q.] "Would you have purchased the Irrigation Systems if you knew prior to doing so that you were going to relinquish ownership?" [Magee:] "Never in a million years. Never."). I therefore find Magee and PNI orally agreed that she was the owner of the Irrigation Systems.

iv. To resist this result, Defendants raise an objection and offer Clayton's testimony. Neither supports a different outcome.

v. Defendants object on hearsay grounds to Magee's testimony about what Gene said to her. But Gene spoke as PNI's representative. *See id.* at 21:2–4; PTO ¶ 1. And statements attributable to PNI are not hearsay. *See* D.R.E. 801(d)(2)(C)–(D). So Defendants' objection is overruled.[17]

---

[17] If anything, Defendants' objection went to weight, not admissibility. Defendants had a fair opportunity to attack the credibility of Magee's testimony. *See* D.R.E. 806 (providing for impeachment of declarant whose statements are admissible as statements of a party opponent under D.R.E. 801(d)(2)(C)–(D)).

vi.     Clayton's testimony does not change my analysis either. Clayton testified that, if the oral agreement exists, Gene would have told him about it. Gene did not tell Clayton about it. Clayton thus reasons that it does not exist. *E.g.*, Tr. at 179:12–15. Measured against the weight of independent evidence to the contrary, Clayton's uncorroborated narrative is too thin to accept.[18]

vii.     Rather than a rebuttal, Clayton's testimony is best understood as one possible explanation for why he tried to draft the 2017 Leases to capture the Irrigation Systems. Without knowledge of the oral agreement, he believed the pre-2017 leases were silent on their ownership. Seen this way, perhaps Clayton really would have honored the oral agreement if he knew about it. *Id.* at 181:8. On these facts, though, Clayton's lack of personal knowledge, standing alone, does not disprove the existence of the oral contract. Defendants simply failed to overcome Magee's proof.

viii.     Although Clayton's 2017 Leases added considerable complexity when compared to the prior leases, the 2017 Leases do not contain an integration clause. The oral agreement is therefore admissible as parol evidence of

---

[18] Defendants did not call any witnesses to support Clayton's testimony. For example, Clayton's son, Clayton Bunting, Jr., is a defendant to this action, and presumably could have offered support for Clayton's version of Gene's business practices. Clayton Jr. did not appear at trial and was not deposed. It remains unclear to me what role, if any, he had in this dispute. Regardless, for the reasons below, I have not made a credibility determination in harmonizing Clayton's testimony with Magee's testimony.

20

a prior agreement between Magee and PNI governing ownership of the Irrigation Systems. The 2017 Leases failed to address ownership, so the oral agreement does not contradict or vary its terms. Under the oral agreement, Magee owns the Irrigation Systems, not PNI.

    ix. Given the oral agreement, the law of fixtures does not apply.[19] So I need not consider Defendants' fixture arguments.[20]

---

[19] *See, e.g.*, 36A C.J.S. *Fixtures* § 19, Westlaw (database last updated May 2023) (explaining that parties can contract around default rules governing fixtures); 35A Am. Jur. 2d *Fixtures* § 16, Westlaw (database last updated May 2023) (same); 2 Tiffany on Real Property § 616, Westlaw (3d ed. database) (last updated Sept. 2022) (same).

[20] I note for completeness that classifying the Irrigation Systems as fixtures seems debatable. The parties address the fixture issue using caselaw from foreign jurisdictions finding differently based on the facts. That is because "no clear majority rule has emerged from the cases on fixtures." Restatement (Second) of Property: Landlord and Tenant § 12.2 n.5, Westlaw (database last updated May 2023). So the answer generally depends on the nature of the purported fixture. Here, both experts testified that the Irrigation Systems are not immobile. *See Fixture*, Black's Law Dictionary (11th ed. 2019) ("Personal property that is attached to land . . . [and] is regarded as an irremovable part of the real property, such as a fireplace built into a home."). Both experts also testified that the Irrigation Systems were designed with towing components, signaling an intent to remove them. *See* Restatement (Second) of Property: Landlord and Tenant § 12.2 n.5 ("With fixtures, there is the further consideration that the property . . . is originally that of the tenant; thus, there should be a strong presumption that [the tenant] should be able to remove [her] own property . . . ."); 2 Tiffany on Real Property § 616 ("The [fixture] rule has been subjected to considerable relaxations in [the] tenant's favor, and certain classes of articles, although of such a character . . . [as] to be treated as permanent annexations, are ordinarily removable by [the tenant] . . . . The modern trend . . . is in favor of the right of the tenant to remove articles affixed to the freehold by him unless it appears from their very nature that they intended to be permanent, or that the parties' intention was that they should be."). And Magee's expert testified that, with innovations in farming technology, the removal process could involve less than a day's worth of work. *See* Tr. at 93–94; *see also* Tr. at 124:16–19 (Def. Expert) (agreeing with Magee's expert that removing a standard well pump would take "less than an hour or so"). Given all this, the parties' dispute reduced to the effect of the concrete pads. Those too, though, were explained. They create stability and prevent

5. PNI breached the oral agreement. Magee therefore has proven actual success on the merits. The next step in the analysis is to determine whether Magee has an adequate legal remedy. She does not.

a. The parties have framed the permanent injunction analysis to require a showing of irreparable harm. Precedent predating this case has clarified that a showing of irreparable harm is not necessary to obtain a permanent injunction. *See COVID-Related Restrictions*, 285 A.3d at 1228–32. Instead, irreparable harm is merely one way of showing an inadequacy of remedies at law. *Id.* at 1232. Another way of satisfying this element is by introducing evidence suggesting that monetary damages would not make the injured party whole. *See id.* at 1231–32. The baseline consideration is whether the injury is such that "no fair and reasonable redress may be had in a court of law and that to refuse the injunction would be a denial of justice." *State v. Del. State Educ. Ass'n*, 326 A.2d 868, 875 (Del. Ch. 1974) (Quillen, C.).

b. Magee has been a farmer her entire life. She testified credibly that the Irrigation Systems are integral to her farming business. Growing season is underway and yet Defendants have prevented her from using her Irrigation Systems. Defendants have not offered to compensate her for the Irrigation Systems or claimed

---

damage. Accordingly, the concrete pads, standing alone, would not support a finding that the Irrigation Systems are permanently anchored to the Frankford Farms.

that damages would make her whole anyway. Without an injunction, Magee would be harmed irreparably.

c.      In contrast, an injunction would not harm PNI. PNI has been managing lucrative farmland for generations. And only two of its farms are irrigated. So PNI will survive without the Irrigation Systems.

d.      More obviously, Defendants have no right to the Irrigation Systems. Yet, Defendants stand to benefit from them. Indeed, Clayton emphasized that, thanks to the Irrigation Systems, the Frankford Farms overperform PNI's other tenancies and generate above-market rent. So whether analyzed using irreparable harm or something else, the upshot is the same: denying Magee injunctive relief under these circumstances would be unjust. *See Beaver Blacktop, Inc. v. DDOT*, 1990 WL 131352, at *3 (Del. Ch. Sept. 10, 1990) (Allen, C.) (An injunction "is a discretionary remedy that a court awards or declines based upon a specific evaluation of the particular circumstances."). Accordingly, I find that Magee lacks an adequate remedy at law.

6.      The final step in the analysis is to determine whether a balance of the equities favors the issuance of an injunction. It does.

a.      Where, as here, a plaintiff has established actual success on the merits and the inadequacy of legal remedies, the balance-of-the-equities inquiry is "narrow[.]" 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and*

23

*Commercial Practice in the Delaware Court of Chancery* § 16.02(f), at 16-39 (2022) (collecting authority). The inquiry is even narrower if the plaintiff also has proven "clear violations of his or her rights." *Higgin v. Albence*, 2022 WL 4239590, at *30 (Del. Ch. Sept. 14, 2022) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49, 54–55 (Del. 1952)), *aff'd in part, rev'd in part on other grounds*, — A.3d —, 2022 WL 17591864 (Del. 2022). In that setting, "the course of a Court of Equity is clear. It has no option but to protect the plaintiff's established legal rights by the award of injunctive process, except in the rare case when the proof establishes equities in favor of the defendant arising from the inequitable conduct of the plaintiff." *Tull v. Turek*, 147 A.2d 658, 663 (Del. 1958).

b. Magee proved a clear violation of her legal rights. Defendants have denied Magee access to her Irrigation Systems based on a right they have never possessed. There is no evidence that Magee has acted inequitably; she simply wants her Irrigation Systems back. Conversely, there is evidence that Defendants have acted inequitably. They seized the Irrigation Systems after one missed rent payment, then took extreme and at times dubious steps[21] to extract as much value from Magee as they could. The equities overwhelmingly tip in favor of an injunction here.

---

[21] For example, Defendants have maintained throughout this litigation that they always thought the Irrigation Systems were improvements or fixtures. Indeed, Clayton testified that he believed they were fixtures regardless of the 2017 Leases. But PNI's termination notice contradicts these positions. The termination notice claimed ownership of the Irrigation Systems under PNI's security agreement, not the 2017 Leases. *See* JX 30 at 5.

7.      Having carefully considered all the evidence presented at trial, I find that Magee owns the Irrigation Systems. Defendants are hereby PERMANENTLY ENJOINED from asserting a right to the Irrigation Systems and SHALL ALLOW Magee to retrieve the Irrigation Systems. The parties shall submit a proposed form of order implementing this post-trial decision as a final judgment.


        */s/ Nathan A. Cook*
        Vice Chancellor Nathan A. Cook
        Date Submitted: June 23, 2023
        Date Decided: June 28, 2023

---

The termination notice does not characterize the Irrigation Systems as improvements. It characterizes them "irrigation system *equipment*"—a form of collateral available for attachment under Article IX of the Delaware Uniform Commercial Code. *Id.* (emphasis added). The security agreement does not even reference the Irrigation Systems. Clayton omitted this from his testimony, focusing instead on what the security agreement does mention—a security interest in Magee's crops. *See* JX 29; Tr. at 168:6–11 (Clayton); *see also* JX 13 § 9 (2017 Frankford Farms Lease) (security interest in crops, not improvements). Plus, it is unclear why Defendants would need a security interest in the Irrigation Systems if they were improvements under the 2017 Leases or fixtures under property law. It would take a special creditor to obtain a security interest in its own assets.

        As another example, Magee alleged that Defendants "engaged in self-help by hiring a third party farmer to harvest [her] crops" and then sold them to a commercial buyer. Dkt. 1 ¶ 29. Magee further alleged that, even after "Defendants were paid the full amounts owed" in the sale, they refused to remove their liens. *Id.* ¶ 30. In other words, Defendants allegedly withheld from Magee $56,030 in excess proceeds from the sale. *Id.* Defendants resolved these allegations before trial. *See* Dkt. 26 (Status Report) (confirming that Defendant released the proceeds). Although I need not rely on these facts to reach my decision, Clayton opened the door to my consideration of them by testifying about the sale. *See* Tr. at 221:1–5; *see also* 1 McCormick on Evidence § 57, Westlaw (8th ed. database) (last updated July 2022); *cf.* D.R.E. 408(a).

25